FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ JUL 18 2012 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
ANTON BRAMBLE,

        Petitioner

   - against -

PATRICK GRIFFIN,

        Respondent.
----------------------------------------------------------- X

**MEMORANDUM**
**DECISION AND ORDER**

12 Civ. 1697 (BMC)

**COGAN**, District Judge.

  Petitioner brings this proceeding for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his conviction for second degree murder for which he was sentenced to twenty-five years to life. Petitioner shot the victim, Caprice Connor, as Connor was entering a convenience store. The store clerk, Suliman Mohamed, knew petitioner as a frequent customer and was an arm's length from petitioner when he saw him shoot Connor. (Although he initially denied seeing the shooter when questioned by the police at the scene, he later acknowledged that he had dissembled because he wanted to avoid involvement). Mohamed identified petitioner as the shooter during the investigation and confirmed that identification at trial. Additional facts will be set forth below as they relate to each of petitioner's points of error.

  Those points are: (1) that the trial court erroneously admitted evidence that petitioner had cut off his dreadlocks and shaved his head either the week before or the week after the shooting, and then improperly gave a "consciousness of guilt" instruction in its charge based on that evidence; (2) that petitioner was denied due process and his right to confront witnesses when the

prosecutor expressed his intention, in his opening statement, to present the testimony of a witness who did not testify, although a detective who did testify made reference to conversations with the absent witness. The Appellate Division held that the claims were, in part, procedurally barred or, alternatively, without merit.

Petitioner's claims do not meet the standard for challenging his conviction, and accordingly, his petition is denied.

I. **Hair-Related Issues**

A. **Evidentiary ruling**

At trial, petitioner's parole officer testified that he had seen petitioner with dreadlocks eight days before the shooting, and that he had always worn dreadlocks during their weekly meetings over the prior three month period. The parole officer further testified that he first saw petitioner with his head shaved six days after the shooting. Through the parole officer, the prosecutor introduced two pictures of petitioner into evidence: one in which he wore dreadlocks and one in which he did not. The prosecution offered this evidence (referred to below as the "dreadlock evidence") to show consciousness of guilt, i.e., that petitioner had shaved his head to look different than he did at the time of the shooting. Petitioner's counsel did not object to this testimony or to the exhibits.

It was a major focus of petitioner's claim on appeal that Mohammed did not testify as to petitioner's hair style at the time of the shooting. However, petitioner's characterization of the record to the Appellate Division was not entirely accurate. After identifying petitioner as the shooter, Mohamed testified as follows:

Q: ... do you know [petitioner] by his name?

A: Yeah. T.

Q: T, as in the letter, T?

A: Yeah.

Q: How did you know him?

A: Customer.

\* \* \*

Q: How often would you see him?

A: Four times – four times, five times a week.

Q: How would you see him – where would you see him?

A: Inside the store.

Q: Tell us what did he do when he came into the store?

A: Buy a sandwich. Drink.

Q: You ever talk to him or anything?

A: Like regular customer.

Q: Like regular customer, did he look the same then than he does now?

A: No.

Q: How did he look different?

A: He used to have dreads.

On appeal, petitioner contended that since no witness identified him as having dreadlocks at the moment of the shooting, or at least at a time much closer to it than eight days before or six days after, the evidence allowed the jury to speculate as to his consciousness of guilt, depriving him of due process. The Appellate Division held that this claim was "unpreserved for appellate review" and that "[i]n any event, the Supreme Court providently exercised its discretion in admitting this evidence as proof that the defendant was conscious of his own guilt." People v. Bramble, 81 A.D.3d 968, 968, 917 N.Y.S.2d 297, 298 (2d Dep't), leave to app. denied, 16 N.Y.3d 893, 926 N.Y.S.2d 29 (2011) (Table).

A federal court should not address the merits of a petitioner's habeas claim if a state court has rejected the claim on "a state law ground that is independent of the federal question raised

and adequate to support the judgment." Lee v. Kemna, 534 U.S. 362, 375, 122 S. Ct. 877, 885 (2002) (quoting Coleman v. Thompson, 501 U.S. 722, 729, 111 S. Ct. 2546, 2554 (1991)). When a state court rejects a petitioner's claim because he failed to comply with a state procedural rule, the procedural bar may constitute an adequate and independent ground for the state court's decision. See, e.g., Coleman, 501 U.S. at 729–30, 111 S. Ct. at 2554; Murden v. Artuz, 497 F.3d 178 (2d Cir. 2007). State procedural grounds are only adequate to support the judgment and foreclose federal review if they are "firmly established and regularly followed" in the state. Lee, 534 U.S. at 376 (quoting James v. Kentucky, 466 U.S. 341, 348, 104 S. Ct. 1830, 1834 (1984)). If a state court rejects a specific claim on an adequate and independent state law ground, then a federal court should not review the merits of the claim, even if the state court addressed the merits of the claim in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n. 10, 109 S. Ct. 1038, 1044 n. 10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).

It is well settled that New York's contemporaneous objection rule, codified at N.Y.C.P.L. § 470.05, is an independent and adequate state law ground that ordinarily precludes federal habeas corpus review. See e.g., Downs v. Lape, 657 F.3d 97, 104 (2d Cir. 2011). Here, because petitioner's trial counsel failed to object to the evidence concerning petitioner's change in appearance, the Appellate Division properly invoked a state procedural bar.

Since the Appellate Division properly relied on a procedural bar, the issue becomes whether any ground exists for reaching the merits notwithstanding that procedural bar.

4

Procedural default on state law grounds may be overcome by a petitioner who either demonstrates "'cause' for the default and 'prejudice attributable thereto,' or . . . that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" Harris, 489 U.S. at 262, 109 S. Ct. at 1043 (citations omitted). Although in some circumstances, ineffective assistance of counsel can constitute "cause" sufficient to avoid a procedural default, id. at 488-89, 106 S. Ct. at 2645-46 (1989), the ineffective assistance claim must itself have been exhausted in the state court. Edwards v. Carpenter, 529 U.S. 446, 451-52, 120 S. Ct. 1587, 1591-92 (2000). To adequately exhaust a claim, a petitioner must "fairly present" the claim to the state court. Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc). A fundamental miscarriage of justice is characterized as "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. 478, 496, 106 S. Ct. 2639, 2649 (1989).

Petitioner may have exhausted this ineffective assistance claim by raising it in the Appellate Division, but barely. There is no separate claim of ineffective assistance for failing to object to the dreadlocks evidence; no reference to ineffective assistance at all in the point heading that challenged the admission of the dreadlocks evidence; and no claim of ineffective assistance anywhere in the text of the discussion of that point. Instead, at the very end of the argument challenging the admission of the dreadlocks evidence, petitioner acknowledged that his attorney had failed to preserve the point by objecting, and petitioner appealed to the Appellate Division's "interests of justice" jurisdiction to hear the claim notwithstanding the lack of preservation. Petitioner then footnoted that sentence with the following:

> To the extent that counsel failed to preserve this issue for appellate review, this Court should find that appellant received ineffective assistance of counsel, see post at 34-35. Strickland v. Washington, 446 U.S. 668 (1984); People v. Baldi, 54 N.Y.2d 137 (1981).

5

That single footnote is petitioner's only reference to ineffective assistance for failure to object to the dreadlocks evidence. There is no mention of either of Strickland's two requirements or argument as to how trial counsel's failure to object was objectively unreasonable or prejudicial.

Nevertheless, I find that the footnote was adequate to exhaust the ineffective assistance claim. For one thing, the Appellate Division did state that petitioner "was not deprived of effective assistance of counsel," Bramble, 81 A.D.3d at 969, 917 N.Y.S.2d at 298.[1] Additionally, petitioner did raise ineffective assistance as to the dreadlocks evidence in his unsuccessful application for leave to appeal to the Court of Appeals. In any event, since the exhaustion requirement is satisfied if a petitioner relies on "pertinent federal cases employing constitutional analysis," Daye, 696 F.2d at 192, petitioner's footnote citation to Strickland is sufficient.

But petitioner's failure to make any argument at all as to why counsel was ineffective makes it more difficult for petitioner to obtain federal habeas corpus relief from the Appellate Division's presumed rejection of that claim. In order to do that, I would have to find that its decision was "contrary to, or involved an unreasonable application of, clearly established" authority of the United States Supreme Court. See 28 U.S.C. § 2254(d). The Supreme Court has recently clarified that this standard of review is extremely narrow, and is intended only as "a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 131 S. Ct. 770, 786 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n. 5, 99 S. Ct. 2781, 2796 n. 5 (1979) (Stevens, J., concurring)).

---

[1] However, that statement may well have applied to petitioner's other partially unpreserved point of error (discussed below), with regard to which he expressly made an ineffective assistance argument.

State court decisions must "be given the benefit of the doubt," Felkner v. Jackson, 131 S. Ct. 1305, 1308 (2011) (citing Renico v. Lett, 130 S. Ct. 1855, 1862 (2010)), and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Harrington, 131 S. Ct. at 786. Indeed, in Harrington, the Supreme Court went so far as to hold that a habeas court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Harrington, 131 S. Ct. at 786. This standard of "no possibility" of disagreement among "fairminded jurists" as to the existence of legal error is arguably the narrowest standard of judicial review in the law. Moreover, in a recent opinion, the Supreme Court clearly expressed a lack of patience with lower courts that view its pronouncements as permitting a substantial measure of flexibility in applying this standard. See Parker v. Matthews, 132 S. Ct. 2148 (2012).[2]

Because the court in Strickland pronounced a general rule and petitioner made no effort on appeal to explain how it applied to his case, the range of reasonable application of precedent available to the Appellate Division was broad indeed. As the Supreme Court has noted:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires

---

[2] Harrington and Cavazos v. Smith, 132 S. Ct. 2 (2011), may have abrogated the oft-quoted language in Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000), that while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." The Harrington/Cavazos standard may not quite require "judicial incompetence," id., but by precluding relief except where the error is "beyond any possibility for fairminded disagreement," it certainly comes close. The Second Circuit has noted that these Supreme Court decisions have narrowed the standard of habeas review that the Circuit previously applied. See Rivera v. Cuomo, 664 F.3d 20 (2d Cir. 2011) (granting motion to vacate its earlier decision granting habeas relief upon consideration of Cavazos), vacating, Rivera v. Cuomo, 649 F.3d 132 (2d Cir. 2011).

considering the rule's specificity. The more general the rule, the more leeway
courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149 (2004). And in Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420 (2009), the Supreme Court confirmed that Strickland falls within the category of general rules: "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied the standard."

Under this narrow standard of review, I see nothing in the Appellate Division's rejection of petitioner's footnote that would be contrary to, or an unreasonable application of, Supreme Court authority. In terms of Strickland's "objective reasonableness" requirement, there is no reason to think that an objection to the parole officer's testimony or the contrasting photographs would have been sustained. It certainly satisfies the standard for relevance to show that petitioner had worn dreadlocks for a very long time (dreadlocks cannot be grown overnight), including and up to at least eight days prior to the shooting, and then had no dreadlocks six days after the shooting; trial counsel could reasonably believe that petitioner's contention that the time span was too long to warrant an inference of consciousness of guilt was a matter for argument, which he made, not admissibility. This is even more apparent because, contrary to petitioner's argument both at trial and in the Appellate Division, the clear implication of Mohamed's testimony, quoted above, was that petitioner did have dreadlocks at the time of the shooting. Although Mohamed did not say so expressly, it is noteworthy that defense counsel deliberately chose not to inquire on cross-examination as to petitioner's appearance at the moment of the shooting, undoubtedly because of the likelihood that Mohamed would have made explicit that which his direct testimony had merely implied.

8

There were additional reasons for defense counsel not to object to the dreadlocks evidence. The prosecution disclosed in its opening statement (and undoubtedly prior to that as well) that it had another witness, Warren Carter, who had seen petitioner running from the store after the shooting, and that Carter knew what petitioner looked like, having seen him in the past. Although, as described below, it turned out that Carter absconded instead of testifying at trial, defense counsel did not know Carter would be unavailable at the time the parole officer testified. There was thus no reason for defense counsel to object based upon the anticipated evidence that would have further focused on petitioner's change in appearance.

Nor could petitioner have shown prejudice to the Appellate Division based on the failure to object – the second requirement of Strickland. This is confirmed by the fact that at the charging conference, by which time the prosecution had finally conceded that it could not produce Carter to testify, defense counsel objected to the trial court's proposed "consciousness of guilt" instruction, arguing that that the parole officer's testimony, even together with Mohamed's, did not show that petitioner had shaved his head close enough in time to the shooting to warrant an inference that petitioner was conscious of his guilt. Defense counsel contended that in the absence of Carter's testimony that petitioner had a shaved head moments before or after the shooting, the fourteen-day window around the shooting during which petitioner had shaved his head was too long a time to prevent the jury from speculating about petitioner's awareness of his guilt. The trial court, however, rejected that argument and determined to give the instruction, stating that it was a jury issue as to what inferences to draw, if any, from the fourteen-day window. Thus it is clear that if trial counsel had raised the same objection to the parole officer's testimony, it would have been overruled for the same reason.

Finally, it did not matter whether petitioner had shaved his head before or after the shooting, as a pre-shooting haircut could have been used by the prosecution to show planning as well as consciousness of guilt. There was no evidence that this was a robbery or random shooting. Mohamed's testimony, rather, was consistent with premeditation. He testified that petitioner repeatedly entered and left the store before Connor arrived, suggesting that petitioner was lying in wait for Connor, and that petitioner ran immediately after firing five shots. If petitioner had cut off his dreadlocks before he shot Connor, then the prosecution could have argued that petitioner had planned to obscure his identity at the time of the shooting to avoid subsequent apprehension.

A defense lawyer need not make futile objections, nor does effective assistance of counsel require objections simply because there is nothing to lose. See Knowles. Here, it was not contrary to any Supreme Court precedent for the Appellate Division to find that defense counsel was not objectively unreasonable in failing to object, and petitioner did not point the Appellate Division to any prejudice resulting from the failure to object. The procedural bar was therefore properly invoked, and petitioner's claim of improper admission of evidence is not cognizable on federal habeas corpus review.

### B. Jury Charge

In the Appellate Division, petitioner raised two claims related to the consciousness of guilt instruction. First, he argued that the instruction should not have been given because the parole officer's testimony, the accompanying "before and after" photographs, and Mohamed's testimony, were insufficient to support an inference of consciousness of guilt. This was the same argument that his trial counsel had made unsuccessfully during the charging conference described above, and the Appellate Division, like the trial court, rejected it on the merits.

Second, petitioner argued that the particular wording of the consciousness of guilt instruction was erroneous because it allegedly did not require the jury to find that the conduct in question (cutting his hair) was linked to the crime. As to that argument, the Appellate Division held that it was "unpreserved for appellate review" and "in any event ... without merit," Bramble, 81 A.D.3d at 298, 917 N.Y.S.2d at 298, because trial counsel had not objected to the particular wording of the instruction.

The second argument is unreviewable here. For the reasons stated above, the Appellate Division properly invoked a procedural bar. Neither cause nor prejudice has been argued that could avoid that procedural bar; no claim of ineffective assistance of counsel was raised concerning it.

As to the first issue, petitioner faces a triply-difficult standard of review. First, as explained above, petitioner must show that the Appellate Division's decision was contrary to, or an unreasonable application of, Supreme Court authority. See 28 U.S.C. § 2254(d). Second, the review of alleged errors in jury instructions is circumscribed. Before a federal court may overturn a conviction due to allegedly erroneous jury instructions, "it must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146, 94 S. Ct. 396, 400 (1973) (internal quotation omitted). Additionally, the Supreme Court has observed that "[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154, 97 S. Ct. 1730, 1736 (1977) (footnote omitted). The appropriate inquiry is not whether the trial court gave a

faulty instruction, but rather "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Cupp, 414 U.S. at 147, 94 S. Ct. at 400. A party who claims he is entitled to federal habeas relief because of erroneous jury instructions faces a significant hurdle. As the Second Circuit has observed: "The Supreme Court has made it clear that errors in instructions to the jury rarely rise to a constitutional level." Victory v. Bombard, 570 F.2d 66, 69 n. 3 (2d Cir. 1978).

Third, it is not clear that petitioner exhausted a federal due process claim with regard to this allegedly improper jury charge. The claim was only argued in two paragraphs in his brief where the only citations were to New York cases –none of which raised any claim that due process was violated. The words "due process" or even "fairness" appear nowhere in those two paragraphs. Under these circumstances, the Appellate Division would have been perfectly justified in viewing this argument as a claim solely under New York law, not calling upon it to resolve any federal constitutional issue.

Even assuming, *arguendo*, that petitioner exhausted this claim, it follows from the preceding discussion that the Appellate Division's rejection of it was not contrary to, or an unreasonable application of, Supreme Court authority. Although the Supreme Court has recognized the propriety of admitting consciousness of guilt evidence as a general matter, see e.g., South Dakota v. Neville, 459 U.S. 553, 561, 103 S. Ct. 916, 921 (1983), the Court has never addressed the propriety of giving a consciousness of guilt jury instruction, let alone laid out any parameters against which a state court decision to do so can be measured. When the Supreme Court has not addressed an issue, it is highly unlikely that a state court's reasonable resolution of the issue will support habeas corpus relief. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been

squarely established by this Court." Knowles, 556 U.S. at 122, 129 S. Ct. at 1419 (internal citations and quotations omitted). The Appellate Division's decision does not give rise to habeas corpus relief.

## II. Missing Witness Issues

The remainder of the issues that petitioner exhausted in the Appellate Division relate to the prosecution's failure to call Warren Carter as a witness. During his opening statement, the prosecutor represented that Carter would testify that he heard the shots; that he saw petitioner fleeing the scene carrying a gun; that he had picked petitioner out of a lineup following the shooting and would identify him at trial; that he knew petitioner from around the neighborhood; and that he would confirm that when he picked petitioner out of the lineup, he noted that petitioner had shaved his head.

Then, during the prosecution's case, the arresting detective, Bourdon, testified that he had interviewed Carter; that Carter and Mohamed had viewed a lineup; that they knew petitioner; and that after the lineup, Bourdon had arrested petitioner.

It became apparent during the prosecution's case that it was not going to be able to produce Carter to testify. The prosecutor kept the court and defense counsel apprised of his ongoing efforts to secure Carter's presence. There was no dispute, not even in the Appellate Division, that the prosecutor had used all reasonable efforts. At one point, the prosecutor advised the court that he had been able to get Carter on the phone, but Carter had responded that he refused to appear at trial. The trial court then issued a material witness order at the prosecutor's request, but Carter had absconded from his known address, and the prosecutor's investigators were unable to take him into custody and bring him to court.

13

Defense counsel never objected or sought a curative instruction concerning Carter's non-appearance. Nor did he object to Bourdin's testimony concerning the lineup. He did, however, argue in summation that the absence of Carter meant that the entire case was dependent on Mohamed's identification of petitioner, and he offered numerous reasons why that identification was not reliable.

The failure to call Carter as a witness produced two issues on appeal.

A.   **Opening statement**

Because of the detailed proffer of Carter's anticipated testimony that the prosecutor provided during his opening statement, petitioner contended that, even in the absence of bad faith on the part of the prosecutor, his due process rights were violated. The Appellate Division held that this claim was unpreserved for review because, when it became apparent during the trial that Carter would not testify, defense counsel did not move for a mistrial. Alternatively, the Appellate Division held that the claim was without merit, noting, "the general rule is that, absent bad faith or undue prejudice, a trial will not be undone. Here, any prejudice to the defendant was averted by the Supreme Court's curative instructions to the jury." Bramble, 81 A.D.3d at 968-69, 917 N.Y.S.2d at 298 (citations and quotations omitted).

The curative instruction to which the Appellate Division referred occurred in response to a note from the jury during deliberations. The jury asked whether it could "take into account the statement that there were two people who identified the defendant in the lineup, even though the guy never became a witness." The court responded, "[N]o. Anything that was said by counsel in either opening or closing statements is not evidence. It's only the testimony from the witnesses and the physical exhibits in evidence that you may consider."

14

Although the Appellate Division's initial holding that the claim was unpreserved seems proper, I will eschew analysis of whether the Appellate Division properly invoked a procedural bar, and the companion question of whether petitioner has demonstrated ineffective assistance of counsel to overcome that bar, because there is Supreme Court authority that requires rejection of petitioner's claim on the merits. In Frazier v. Cupp, 394 U.S. 731, 89 S. Ct. 1420 (1969), the prosecutor, in his opening statement, recited the testimony that he expected to introduce from the defendant's co-conspirator, who had pled guilty and was awaiting sentencing. When the co-conspirator took the stand, however, he refused to testify, invoking his privilege against self-incrimination. The trial court instructed the jury that they "must not regard any statement made by counsel in your presence during the proceedings concerning the facts of this case as evidence," and denied defense counsel's motions for a mistrial. The Supreme Court held that the curative instruction was sufficient to protect the defendant's constitutional rights:

> [H]ere we have no more than an objective summary of evidence which the prosecutor reasonably expected to produce. Many things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance. Certainly not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given. ... [I]it does not seem at all remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial. At least where the anticipated, and unproduced, evidence is not touted to the jury as a crucial part of the prosecution's case, it is hard for us to imagine that the minds of the jurors would be so influenced by such incidental statements during this long trial that they would not appraise the evidence objectively and dispassionately.

Id. at 736, 89 S. Ct. at 1423 (internal citations omitted).

Frazier is not materially distinguishable from the instant case. The prosecutor's summary of Carter's anticipated testimony did not occur until the middle of his opening statement, which focused more heavily on Mohamed and the police investigation. Indeed, the discussion of Carter's likely testimony takes up just one transcript page in the opening statement. Moreover,

15

the curative instruction given here was more targeted than the one in Frazier, and was a direct response to the same conduct which petitioner is now challenging.³ Considering Frazier, the Appellate Division's alternative holding rejecting petitioner's claim was anything but contrary to, or an unreasonable application of, Supreme Court precedent. ⁴

B. **Confrontation Claim**

Det. Bourdin's testimony presents a somewhat closer question. At the time he testified that he arrested petitioner after Mohamed and Carter had viewed a lineup (without expressly stating that either had picked petitioner out of the lineup), the prosecutor still had hopes of securing Carter's appearance. There can be no doubt that the jury considered drawing the inference, based on Bourdin's testimony, that Carter had identified petitioner in the lineup. We know this because after the jury had delivered the note, described above, asking whether it could "take into account the statement that there were two people who identified the defendant in the lineup, even though the guy never became a witness," and had received the trial court's response that opening statements were not evidence and so it could not, it submitted another note. This second note inquired: "One of the police officers stated that a 2nd person ID'd Bramble at the lineup. Can we take that testimony into account? This is a repeat question but it is about testimony, not the lawyer's statements" (emphasis in original). The trial court again gave a curative instruction:

> Detective Bourdon testified that he conducted a line-up and there were two individuals who viewed the lineup: Mr. Mohamed and Mr. Carter. At no time during [his] testimony did he indicate the results of either line-up. The only witness who testified about making an identification [at the] lineup was Mr.

---

³ The Supreme Court noted in Frazier that a "more specific limiting instruction might have been desirable, but none was requested." Id. at fn*.

⁴ Although Frazier focused specifically on the Confrontation Clause, its analysis is equally applicable to a due process challenge.

16

Mohamed. So that is the only evidence regarding a line-up identification at this trial. And, therefore, there is no other witness who made the line-up identification that is the subject of any evidence.

The Appellate Division's holding that petitioner's claim was unpreserved was proper. Trial counsel never objected to the testimony, which triggered New York's contemporaneous objection waiver, discussed above.

Although petitioner made a perfunctory argument in the Appellate Division that his counsel was ineffective for failing to object, this argument does not constitute cause to relieve petitioner of the procedural bar because, as Strickland requires, there was no prejudice to petitioner. As the Supreme Court indicated in Frazier, and as its abundant progeny confirms, juries are presumed to follow the court's instructions regarding the limitations on their review of evidence. See e.g. Richardson v. Marsh, 481 U.S. 200, 206, 211, 107 S. Ct. 1702 (1987). In the usual case, even a general instruction put to a jury is sufficient to trigger this presumption. See e.g., U.S. v. Adekanbi, 675 F.3d 178, 186 (2d Cir 2012); Mason v. Greene, No. 04 Civ. 3606(PKC), 2009 WL 577280 at *12 (S.D.N.Y. March 06, 2009); Wicks v. Miller, No. 05 Civ. 5341 (JGK), 2007 WL 1434992 at *6 (S.D.N.Y. May 15, 2007); Charlemagne v. Goord, No. 05 Civ. 9890(DAB)(HBP), 2008 WL 2971768 at*24 (S.D.N.Y. June 30, 2008). Here, however, there was much more, as this was an unusually astute jury. On its own, it identified the very legal issues that petitioner would raise on appeal, questioned the court about them, and received clear directions about what it could and could not consider.[5] Since the jury specifically inquired about these issues, there is even more reason to conclude that it followed the trial court's

---

[5] In the Appellate Division, petitioner contended that because the trial court did not state that it was "striking" the prosecutor's opening remarks concerning Carter, or Boudin's testimony concerning Carter, its curative instructions were inadequate. To the contrary, the very clear limitations of which the trial court advised the jury, coming at the very moment when the jury was considering the issue, seem far more important than a formalistic invocation of "striking" material from the record.

instructions responding to those questions, as it would make no sense for the jury to have asked the question and then disregard the court's direct answer.

Moreover, the Appellate Division's alternative rejection of this claim on the merits was not contrary to, or an unreasonable application of, Supreme Court authority. The closest authority appears to be Bruton v. U.S., 391 U.S. 123, 88 S. Ct. 1620 (1968), which holds that a co-defendant's out-of-court statement expressly implicating a defendant violates the Confrontation Clause. However, Bruton is not violated when the statement admits of alternative interpretations, one of which may implicate the defendant but the other of which does not, even if the former interpretation is the more likely. See Gray v. Maryland, 523 U.S. 185, 118 S. Ct. 1151 (1998); U.S. v. Lung Fong Chen, 393 F.3d 139 (2d Cir. 2004). Often, compliance with Bruton is achieved by redacting a written statement or limiting testimony so that the implication of the defendant is not the only interpretation available to the jury. See In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 134-35 (2d Cir 2008); U.S. v. Lee, 549 F.3d 84, 97 n.1 (2d Cir. 2008).

Here, even without the Court's curative instruction, Bourdin's testimony was carefully limited to allow the possibility that only one of the two line-up witnesses identified petitioner. Although the jury, as indicated by its note, considered drawing the inference that Carter had also identified petitioner, its specific question to the court resulted in an answer that precluded that inference.

The complicating factor, of course, is that the prosecutor, not anticipating Carter's disappearance at the commencement of the trial, advised the jury in his opening statement that Carter would identify petitioner, thus driving the jury towards the inference about which it inquired. Moreover, it is axiomatic that Bruton errors cannot be cured by limiting instructions.

18

See Burton, 391 U.S. at 137, 88 S. Ct. at 1628. Here, however, because there was no Bruton error in eliciting Bourdin's carefully structured testimony in the first instance, it must be concluded that the jury ultimately declined to draw the inference about which it inquired. To hold otherwise would mean that no error occurred *until* the jury asked the question, which would be illogical.

Accordingly, petitioner is not entitled to habeas corpus relief on this point of error.

## **CONCLUSION**

The petition for a writ of habeas corpus is denied and the petition is dismissed. A certificate of appealability and *in forma* pauperis status is granted as to the issues raised by Bourdin's testimony only. Specifically, the following issues are certified: (1) was petitioner's counsel ineffective under Strickland for failing to move for a mistrial based on Bourdin's testimony when it became apparent that Carter would not testify; and (2), was the Appellate Division's alternative holding on the merits contrary to or an unreasonable application of Bruton or Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004).

I grant the certificate as to these issues as the law is not well-defined on the ability of a prosecutor to sculpt a police officer's testimony to avoid Confrontation Clause issues. See Summerville v. Conway, No. 07 Civ. 4830 (MBC)(RML), 2008 WL 3165850 (E.D.N.Y. Aug. 6, 2008); Galdamez v. Keanne, Nos. 2000–CV–4066 (JBW), 03–MISC–0066 (JBW), 2003 WL 21847382 (E.D.N.Y. August 04, 2003). The "implied hearsay" inherent in such limited testimony is often elicited for a legitimate and indeed often necessary purpose – the prosecutor does not want the jury to think a police officer acted arbitrarily or to speculate as to an improper purpose in focusing on a defendant, and some exposure to the investigative process is viewed as necessary to dispel this concern. This case, in my view, presents a useful scenario to examine

these issues because of the prosecutor's good-faith but mistaken belief that Carter would testify, thus resulting both in the opening statement's references to Carter and Bourdin's testimony, which were received in anticipation of Carter's appearance. I therefore find that petitioner has made a substantial showing of the possible denial of a constitutional right. See Coppedge v. U.S., 369 U.S. 438, 82 S. Ct. 917 (1962).

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
July 18, 2012